## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) MISTY HARDEN and ROBERT HARDEN, as Guardians and Next Friend of SHAUN SMITH, an incapacitated adult; and (2) SAVANAHA WORKS, <br><br> Plaintiffs, <br><br> v. <br><br> (1) B.J. HEDGECOCK, SHERIFF OF PUSHMATAHA COUNTY, OKLAHOMA, in his official capacity, (2) TAMARA RASHAE NICHOLS, and (3) TIMOTHY BYERS, <br><br> Defendants. | Case No.  19-CV-379-KEW <br><br> ATTORNEY LIEN CLAIMED JURY TRIAL DEMANDED |

## COMPLAINT

**COME NOW** the Plaintiffs, Misty Harden and Robert Harden, as Guardians of Next Friends of Shaun Smith ("Mr. Smith" or "Smith"), an incapacitated adult, and Savanaha Works ("Ms. Works" or "Works") (collectively referred to as "Plaintiffs"), by and through their attorneys of record, and for their causes of action against the Defendants, allege and state as follows:

## INTRODUCTORY STATEMENT

1.     "Sexual abuse of a prisoner by a corrections officer has no legitimate penological purpose, and is simply not part of the penalty that criminal offenders pay for their offenses against society." *Smith v. Cochran,* 339 F.3d 1205, 1213 (10th Cir. 2003). "Sexual abuse is repugnant to contemporary standards of decency and allegations of sexual abuse can satisfy the objective component of an Eighth Amendment excessive force claim." *Smith,* 339 F.3d at 1212.

1

2.      Furthermore, "it is clearly established that a prison official's deliberate indifference to sexual abuse by prison employees violates the Eighth Amendment." Keith v. Koerner, 707 F.3d 1185, 1188 (10th Cir. 2013).  And because "a prison official's failure to protect an inmate from a known harm may constitute a constitutional violation," the Tenth Circuit has held it to be clearly established that inmates possess "a constitutional right to expect" that jail officials will "reasonabl[y] protect[ ]" them from such abuse. *Keith v. Koerner,* 843 F.3d 833, 841-42 (10th Cir. 2016).

3.       Here, Mr. Smith and Ms. Works were both subjected to sexual abuse by detention officers at the Pushmataha County Jail ("Jail"), in violation of their Constitutional rights.  And this sexual abuse was entirely preventable.

4.      The leadership within the Pushmataha County Sheriff's Office ("PCSO") utterly failed in its duty to protect inmates from such harm.  Indeed, PCSO fostered a lawless and undisciplined culture of "anything-goes" among the detention officers at the Jail.  There was a complete failure to supervise.  The Jail was severely understaffed. Inmates freely moved within the Jail, and detention officers facilitated the movement and use of illicit drugs.  Sexual misconduct was commonplace.   Written policies concerning contact with inmates were not adhered to nor enforced.

5.      In sum, the Pushmataha County Jail has been out of control for years, rendering the Constitutional violations complained of herein eminently foreseeable. Plaintiffs have filed this action for the dual purposes of seeking compensation for their injuries and deterring future Constitutional violations.  It is their hope that through this litigation, the full extent of the PCSO's Constitutional failures at the Jail will be exposed and eradicated.

## JURISDICTION AND VENUE

6.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Eighth Amendment and/or Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

7.      The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

8.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## PARTIES

9.      Mr. Smith was, at the time of the wrongs perpetrated against him as alleged below, in the care, custody, and control of the Pushmataha County Sheriff's Office in Pushmataha County, State of Oklahoma. [1]

10.     Ms. Works was, at the time of the wrongs perpetrated against her as alleged below, in the care, custody, and control of the Pushmataha County Sheriff's Office ("PCSO") in Pushmataha County, State of Oklahoma.

---

[1] Shaun Smith's claims are refiled pursuant to Oklahoma's "savings statute." *See* 12 Okla. Stat. § 100; *Eastom v. City of Tulsa*, 783 F.3d 1181, 1184 (10th Cir. 2015) (holding that Oklahoma's "savings statute" applies to claims filed under 42 U.S.C. § 1983). The original action was timely filed in the District Court of Pushmataha County, Oklahoma on January 5, 2018. *See* 18-cv-00046-RAW (E.D. Okla.), at Doc. 2-2. That action was dismissed, pursuant to a Joint Stipulation of Dismissal Without Prejudice, on February 27, 2019. *See* 18-cv-00046-RAW (E.D. Okla.), at Doc. 63.

11.     Defendant Sheriff B.J. Hedgecock ("Sheriff Hedgecock" or "Hedgecock") is the Sheriff of Pushmataha County, Oklahoma, residing in Pushmataha County, Oklahoma and acting under color of state law. Sheriff Hedgecock is sued purely in his official capacity. It is well-established, as a matter of Tenth Circuit authority, that a § 1983 claim against a county sheriff in his official capacity "is the same as bringing a suit against the county." *Martinez v. Beggs,* 563 F.3d 1082, 1091 (10th Cir. 2009). *See also Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010). *See also Kentucky v. Graham,* 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). Thus, in suing Sheriff Hedgecock in his official capacity, Plaintiff has brought suit against Pushmataha County/PCSO.  The Pushmataha County Sheriff is ultimately responsible for ensuring the safety and well-being of inmates detained and housed at the Pushmataha County Jail, including the provision of appropriate housing and security. In addition, the Pushmataha County Sheriff is responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, policies, practices, procedures, and/or customs of PCSO and the Pushmataha County Jail, including the policies, practices, procedures, and/or customs that violated the Plaintiffs' rights as set forth in this Complaint.

12.     Defendant Detention Officer Tamara Rashae Nichols ("Officer Nichols" or "Nichols") was, at all times relevant hereto, an employee of the Pushmataha County Sheriff's Office, acting under color of state law.  Officer Nichols was responsible, in part, for ensuring Mr. Smith's health and well-being, and assuring that the housing and safety needs of Mr. Smith were met, during the time he was in the custody of PCSO. Nichols is being sued in her individual capacity.

13.     Defendant Detention Officer Timothy Byers ("Officer Byers" or "Byers") was, at all times relevant hereto, an employee of the Pushmataha County Sheriff's Office, acting under color of state law.  Officer Byers was responsible, in part, for ensuring Ms. Works health and well-being, and assuring that the housing and safety needs of Ms. Works were met, during the time she was in the custody of PCSO. Byers is being sued in his individual capacity.

## FACTUAL ALLEGATIONS

### A.  Factual Allegations as to Mr. Smith

14.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 13, as though fully set forth herein.

15.     Mr. Smith was placed in the Pushmataha County Jail in February of 2016.

16.     About three weeks after being transferred to the Jail, Mr. Smith was placed on "trustee" status, and was stationed at the front of the Jail.  It was at this time that Mr. Smith first encountered Officer Nichols.

17.     Officer Nichols was, at all relevant times herein, on felony probation during her employment with PCSO. *See* Case No. CF 2013-117 (Pushmataha County). Yet, astonishingly, the Sheriff's Office placed Officer Nichols on night shift, where she was completely unsupervised as the only jailer on duty.

18.     It was well-known to Officer Nichols that Mr. Smith struggled with drug addiction, specifically opiate addiction.  Officer Nichols preyed on Mr. Smith's addiction by engaging in a pattern of conduct wherein she provided Mr. Smith and other (unnamed) inmates with illicit drugs in exchange for sexual intercourse with Smith.

19.     It was understood that if Smith did not have sex with Officer Nichols, she would stop the flow of drugs to other inmates, including gang members, which would have caused those other inmates to be furious with Smith, and potentially violent.  Smith also understood that if he did not have sex with Officer Nichols,  he would lose his position as trustee and lose access to opiates being smuggled into the Jail.

20.     One night, while serving as a trustee at the Jail, Mr. Smith witnessed Officer Nichols smoke methamphetamine at the front desk. After smoking the meth, Officer Nichols told Smith that she was going to "need a little more" out of him. Officer Nichols then began "rubbing" her hands on Smith.

21.     Officer Nichols then took Mr. Smith to the Jail's laundry room and had sex with him.  After the sex was over, Smith took some morphine that Officer Nichols had set aside for him in an unlocked medicine cabinet.

22.     Because the Jail was understaffed, and Officer Nichols was unsupervised as the only jailer on night shift, she was free to take illicit drugs, provide drugs to inmates and have sex with Mr. Smith without detection.

23.     Officer Nichols later pled guilty to Second Degree Rape in case number CF 2016-53 (Pushmataha County).  As part of the guilty plea, Officer Nichols admitted to having sexual intercourse with Mr. Smith while he was an inmate at the Jail.

24.     The day after the sexual contact with Officer Nichols, Mr. Smith reported the incident to the Jail Administrator, Linda Cunningham.  However, the Jail Administrator did not discipline Mr. Smith or Officer Nichols. Mr. Smith continued in his role as trustee. The Jail Administrator did not report the incident to the District Attorney or any outside agency.

25.    The day after the sexual contact with Officer Nichols, Mr. Smith also reported the incident to a detention officer, Jennifer Teafatiller.

26.    On the 22nd day of April 2016, Officer Nichols and Smith were caught removing inmate property from the property drawer.  An OSBI investigation ensued. During the OSBI investigation, it was revealed that Officer Nichols had sex with Smith at the Jail.

27.    As discussed in more detail below, Officer Nichols had a significant prior history of having sexual intercourse with inmates while she was employed at the Pushmataha County Jail.

28.    And as further discussed below, upon information and belief, the Sheriff and Undersheriff at the time, and other County employees, had actual knowledge of Officer Nichols prior sexual relations with at least one other County inmate, "Little Jeff".

29.    Officer Nichols and PCSO knew or it was obvious that Mr. Smith was particularly vulnerable to manipulation as:

   a. Smith's first custodial placement/confinement was in Meadow Brook Inpatient Mental health facility, a fact known to Defendants.

   b. Smith was prescribed psychotropic medication for multiple mental disorders while an inmate of the Pushmataha County Jail,

   c. Smith had a low to very low range score in his cognitive abilities as tested on September 25th , 2015, by Zen Ghee, LPC, LADC, a fact known to Defendants.

   d. Smith has a Full-Scale IQ of 57 as established and confirmed in his physiological evaluation with IQ testing completed on July 1, 2017 by Dr. Daniel Stockley, Ph.D.

30.    Officer Nichols and PCSO had a duty to protect the incapacitated Smith from reasonably foreseeable threats to his health, safety, and well-being.

31.     Officer Nichols and PCSO utterly failed to protect Mr. Smith and he has suffered damages as a result.

32.     Officer Nichols and PCSO were deliberately indifferent to Mr. Smith's health and safety.

33.     Officer Nichols' conduct constitutes excessive and unreasonable use of force, in violation of Mr. Smith's Constitutional rights.

34.     As a direct and proximate result of Defendants' conduct, Mr. Smith experienced and continues to experience, severe emotional distress, mental anguish, and the damages alleged herein.  Mr. Smith is entitled to an award of compensatory damages through his guardians.

**B.  Factual Allegations as to Ms. Works**

35.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 34, as though fully set forth herein.

36.     In November of 2017, Ms. Works was an inmate at the Jail.

37.     On information and belief, consistent with the Jail's established practice, on November 13, 2017, PCSO had only one unsupervised jailer working the night shift at the Jail.  That jailer was Officer Byers.

38.     Having only one unsupervised male officer on duty was in violation of the Oklahoma Jail Standards. The Oklahoma Jail Standards require that a jail's policies and procedures specify a system for the supervision of female prisoners by male staff. *See* OAC 310:670-5-3(f). The Oklahoma Jail Standards further specifically provide that "[w]hen both male and female prisoners are housed in a facility, at least one male and one female

trained jailer shall be available to perform sensitive functions and procedures as necessary to accommodate prisoner gender." *Id*. at 670-5-3(g).

39.     Sometime after "lights out" (2200 hours) on November 13, 2017, Officer Byers  told Ms. Works to go to the laundry room to get clothing for other inmates.  Officer Byers entered the laundry room with Ms. Works.  The two of them were alone. Once in the laundry room, Officer Byers commanded Ms. Works to pull her pants down.  Works initially refused, but Officer Byers continued to demand that she pull her pants down.

40.     Fearing the consequences if she refused Officer Byers' commands, Ms. Works relented and pulled her pants down.  After Ms. Works pulled her pants down, Officer Byers commanded her to "touch her toes".  While Ms. Works was in this completely helpless position, Officer Byers penetrated Ms. Works' vagina. Byers then asked Ms. Works what the problem was and repulsively remarked that she was "kind of dry."  Ms. Works told Byers that she did not want to have sex with him.  Ms. Works was alone with Officer Byers in the laundry room for approximately 10 minutes.

41.     A subsequent investigation produced surveillance video of Byers apparently having sex with Works at the Jail.

42.     Recognizing the extraordinary vulnerability of persons who are inmates of a county jail for any reason and the extraordinary opportunities of sheriffs and of employees of sheriffs to prey upon the vulnerability of such persons, the statutes of the State of Oklahoma specifically protect such persons. Under Oklahoma criminal statutes, any state, federal, county, municipal or political subdivision employee who has sexual intercourse with a person under the supervision of a sheriff is guilty of the crime of rape. *See* 21 Okla. Stat. § 1111(A)(7).

43.     Officer Byers was arrested for Second Degree Rape in connection with his assault of Ms. Works.

44.     Officer Byers and PCSO had a duty to protect Ms. Works from reasonably foreseeable threats to his health, safety, and well-being.

45.     Officer Byers and PCSO utterly failed to protect Ms. Works and she has suffered damages as a result.

46.     Officer Byers and PCSO were deliberately indifferent to Ms. Works' health and safety.

47.     Officer Byers' conduct constitutes excessive and unreasonable use of force, in violation of Ms. Works' Constitutional rights.

48.     As a direct and proximate result of Defendants' conduct, Ms. Works experienced and continues to experience, severe emotional distress, mental anguish, and the damages alleged herein.

## C.  Official Policies or Customs

49.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 48, as though fully set forth herein.

50.     PCSO's persistent failure to supervise, failure to train and understaffing at the Jail is staggering, and was a moving force behind the Constitutional deprivations at issue.

51.     Defendants' deliberate indifference to Plaintiffs' health and safety was in furtherance of and consistent with policies or customs which the Pushmataha County Sheriff promulgated, created, implemented or possessed responsibility for.

52.     The Tenth Circuit has previously found a county sheriff liable for staff-on-inmate sexual assault where the sheriff -- Sheriff Salazar -- failed to enforce his own "no-contact" policy. *Tafoya v. Salazar,* 516 F.3d 912, 918-19 (10th Cir. 2008).  To the extent that Pushmataha County had any written policies regarding inappropriate contact with inmates, including sexual contact, those policies were not followed nor enforced, in deliberate indifference to inmate health and safety.

53.     In finding Constitutional liability at the county level, the *Tafoya* Court pointed to evidence of an "undisciplined culture of 'anything-goes' among the detention officers [that] remained unaddressed and unmitigated by Sheriff Salazar, who continued to employ a hands-off approach to jail management."  *Tafoya,* 516 F.3d at 919.  Here, the Sheriff's "management style" was "hands-off" at best, and describing the culture at the Jail as "undisciplined" and "anything goes" would be charitable.  There was an utter absence of supervision and accountability at the Jail, and an acquiescence and acceptance of lawless behavior, amounting to reckless indifference to the safety and well-being of the inmates.

54.     About a year prior to Mr. Smith's incarceration, Officer Nichols began a sexual relationship with another male inmate known as "Little Jeff." The sexual relationship progressed to the point that Little Jeff and Officer Nichols conceived twins at the Jail.

55.      Like Mr. Smith, "Little Jeff" had also been a trustee in the front area of the Jail.  Officer Nichols began having sexual intercourse with "Little Jeff" in the Jail's laundry room. Little Jeff had sex with Officer Nichols in the Jail's laundry room five or six times.

56.     The sexual relationship between Little Jeff and Officer Nichols was blatant. Other inmates could hear Little Jeff and Officer Nichols having sex through the vents.

However, because the Jail was understaffed, there was no other officers on duty on the night shift to witness the sexual misconduct.

57.     Officer Nichols would also open the laundry room door and allow other male inmates to have sex with female inmates.

58.     Officer Nichols had sex at the Jail with yet another male inmate, B.B., prior to her relationship with Little Jeff.

59.     The Pushmataha County Sheriff at the time, Terry Duncan, and the Pushmataha County Undersheriff at the time, Darrel Nichols[2], were both aware that Officer Nichols and Little Jeff were having a sexual relationship at the Jail.  However, neither Former Sheriff Duncan nor Undersheriff Nichols disciplined Officer Nichols or Little Jeff in any way. Neither Former Sheriff Duncan nor Undersheriff Nichols contacted the District Attorney or any outside agency to report the sexual misconduct. On the contrary, by taking no action, Former Sheriff Duncan and Undersheriff Nichols covered up and tacitly encouraged such sexual misconduct at the Jail.

60.     The Jail Administrator also knew that Officer Nichols and Little Jeff were having sex at the Jail.  Like the Former Sheriff Duncan and Undersheriff Nichols, the Jail Administrator did nothing to discipline any of the parties involved nor did she report the sexual misconduct to any higher authority.

61.     Similarly, another male Deputy at the Jail had knowledge of Officer Nichols and Little Jeff's sexual relationship.  Rather than take any action to report or curtail the sexual misconduct, this Deputy told Little Jeff that he "didn't blame him" for having sex with Officer Nichols at the Jail.

---

[2] Upon information and belief, Darrel Nichols is the uncle of Defendant Tamara Nichols.

62.     In a display of the permissive and lawless atmosphere at Jail, another Deputy, who was on the PCSO canine unit, flippantly commented to Little Jeff, while he was working as a Jail trustee, "I know all about your little sex scandal going on…."

63.     Also during 2015, another female jailer, Retina Harjo, and an inmate named Cody Maxwell would meet outside of the Jail between the courthouse and the "OSU building".   It is believed that Officer Harjo and Cody Maxwell also had a sexual relationship.  Inmate Maxwell was permitted by PCSO staff to "jump the fence" to meet up with Officer Harjo.

64.     In May of 2018, under Sheriff Hedgecock's watch, another female PCSO detention officer, Ashley Elizabeth Parra, had a sexual relationship with a male inmate at the Jail.  Officer Parra had sex with the male inmate in the inmate visitation room at the Jail.  Officer Parra was convicted of second-degree rape in May of 2019.

65.     Contraband, including methamphetamine, marijuana, cigarettes and pills, was rampant at the Jail. Illicit drugs were brought into the Jail by family members through commissary. Officer Nichols, and other PCSO employees, would knowingly allow the drugs to come into the Jail.  Officer Nichols would give methamphetamine, marijuana and cigarettes to Little Jeff, Shaun Smith and others at the Jail.

66.     On information and belief, the Jail Administrator, Linda Cunningham, was aware that drugs were illegally coming into the Jail, but did nothing to stop it.  In fact, Mr. Smith has testified that he gave opiates to the Jail Administrator on several occasions.

67.     During all pertinent times, the Jail was severely understaffed.  During the night shift, there is only one jailer on duty.  Cells were frequently left unlocked and inmates were permitted to move around the Jail. The laundry room was a known blind spot in the

Jail where there was no video surveillance, and jailers and inmates were free to, and did, have sexual relations.  Because there was only one officer on shift at night, there was no one to monitor whether the officer and inmates were engaging in misconduct. Little Jeff was allowed to sit at the front desk and watch the surveillance cameras to make sure no one would catch him and Officer Nichols having sex.

68.     As another illustration of the utter lack of supervision at the Jail, trustees were given keys to the PCSO evidence room.  On information and belief, Sheriff Hedgecock gave the evidence room keys to two inmate trustees.  Predictably, the trustees would use the keys to open the evidence room and steal contraband, including narcotics and paraphernalia.

69.     Defendants' deliberate indifference to the safety and welfare of Plaintiffs is evinced by their persistent violation of numerous provisions of the Oklahoma Jail Standards (OAC 310:670, *et seq.*). For instance, the Oklahoma Jail Standards provide:

➢ "[Jail] [p]olicies and procedures shall specify a system for the supervision of female prisoners by male staff . . . ."

➢ "When both male and female prisoners are housed in a facility, at least one male and one female trained jailer shall be available to perform sensitive functions and procedures as necessary to accommodate prisoner gender."

➢ "No one person shall be permitted to enter a prisoner's cell or other area in which a prisoner is confined, past the last locked door, without backup assistance."

➢ "Jailer posts shall be located and staffed to monitor all prisoner activity either physically or electronically . . . ."

➢ "There shall be sufficient staff to perform all assigned functions relating to security, custody and supervision of prisoners."

Each of these provisions of the Oklahoma Jail Standards states widely accepted minimum standards for the operation of jails. The failure to uniformly and consistently observe such

standards evinces deliberate indifference to the safety and security of inmates generally, and Plaintiffs specifically. These standards were clearly and flagrantly violated with respect to the Plaintiffs. The sexual assaults of the Plaintiffs resulted from a total and complete breakdown in the minimum supervision, security and housing practices that Defendants are required to provide.

70.     PSCO failed to train detention staff with respect to its policies and specifically, with respect to appropriate contacts with inmates. This failure to train constitutes deliberate indifference to the health and safety of inmates like the Plaintiffs.

71.     These policies, customs and practices were a moving force behind Plaintiffs' Constitutional injuries.

## CLAIMS FOR RELIEF

### Violation of the Eighth and/or Fourteenth Amendments to the Constitution of the United States (42 .S.C. § 1983)

**A.  Defendant Nichols**

72.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 71, as though fully set forth herein.

73.     "The Eighth Amendment's prohibition of cruel and unusual punishment imposes a duty on prison officials to provide humane conditions of confinement, including reasonable safety from serious bodily harm." *Tafoya v. Salazar,* 516 F.3d 912, 916 (10th Cir. 2008) (citing *Farmer v. Brennan,* 511 U.S. 825, 832 (1994)).  Pretrial detainees, who have not been convicted of a crime, have constitutional rights -- under the Due Process Clause of the Fourteenth Amendment -- at least as protective as those enjoyed by convicted prisoners under the Eighth Amendment. *See Bell v. Wolfish,* 441 U.S. 520, 535, n. 16, 545

(1979).

74.     The law is clearly established that the rape or sexual assault of an inmate by a prison guard constitutes a violation of the Constitution. *See, e.g., Castillo v. Day,* 790 F.3d 1013, 1018-19 (10th Cir. 2015).  The Tenth Circuit has stated that "[s]exual abuse is repugnant to contemporary standards of decency and allegations of sexual abuse can satisfy the objective component of an Eighth Amendment excessive force claim." *Smith v. Cochran,* 339 F.3d 1205, 1212 (10th Cir. 2003).  *See also Hovater v. Robinson,* 1 F.3d 1063, 1068 (10th Cir. 1993) ("[A]n inmate has a constitutional right to be secure in her bodily integrity and free from attack by prison guards.").

75.     Officer Nichols' sexual abuse of Mr. Smith was coercive, predatory and repugnant to contemporary standards of decency.

76.     Officer Nichols' sexual abuse of Mr. Smith constitutes excessive and unreasonable force under an objective standard and/or subjective standard.

77.      In sexually abusing Mr. Smith, Officer Nichols failed to protect him from harm and was deliberately indifferent to his health and safety.

78.     As a direct and proximate result of Officer Nichols' conduct, Mr. Smith experienced and continues to experience severe emotional distress, mental anguish, and the damages alleged herein.

**B.     Defendant Byers**

79.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 78, as though fully set forth herein.

80.     "The Eighth Amendment's prohibition of cruel and unusual punishment imposes a duty on prison officials to provide humane conditions of confinement, including

reasonable safety from serious bodily harm." *Tafoya v. Salazar,* 516 F.3d 912, 916 (10th Cir. 2008) (citing *Farmer v. Brennan,* 511 U.S. 825, 832 (1994)).  Pretrial detainees, who have not been convicted of a crime, have constitutional rights -- under the Due Process Clause of the Fourteenth Amendment -- at least as protective as those enjoyed by convicted prisoners under the Eighth Amendment.  *See Bell v. Wolfish,* 441 U.S. 520, 535, n. 16, 545 (1979).

81.     The law is clearly established that the rape or sexual assault of an inmate by a prison guard constitutes a violation of the Constitution. *See, e.g., Castillo v. Day,* 790 F.3d 1013, 1018-19 (10th Cir. 2015).  The Tenth Circuit has stated that "[s]exual abuse is repugnant to contemporary standards of decency and allegations of sexual abuse can satisfy the objective component of an Eighth Amendment excessive force claim." *Smith v. Cochran,* 339 F.3d 1205, 1212 (10th Cir. 2003).  *See also Hovater v. Robinson,* 1 F.3d 1063, 1068 (10th Cir. 1993) ("[A]n inmate has a constitutional right to be secure in her bodily integrity and free from attack by prison guards.").

82.     Officer Byers' sexual abuse of Ms. Works was forceful, coercive, predatory and repugnant to contemporary standards of decency.

83.     Officer Byers' sexual abuse of Ms. Works constitutes excessive and unreasonable force under an objective standard and/or subjective standard.

84.      In sexually abusing Ms. Works, Officer Byers failed to protect her from harm and was deliberately indifferent to her health and safety.

85.     As a direct and proximate result of Officer Byers conduct, Ms. Works experienced and continues to experience pain, severe emotional distress, mental anguish, and the damages alleged herein. Ms. Works is entitled to compensatory damages.

C.     **Official Capacity/Municipal Liability (Sheriff Hedgecock)**

86.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 85, as though fully set forth herein.

87.     The aforementioned acts of unconstitutional sexual abuse are causally connected with official customs, practices, and policies which Pushmataha County/the Pushmataha County Sheriff/PCSO promulgated, created, implemented and/or possessed responsibility for.

88.     Such policies, customs and/or practices are specifically set forth in paragraphs 49-71, *supra.*

89.     Pushmataha County/the Pushmataha County Sheriff/PCSO, through its continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices; in spite of their known and obvious inadequacies and dangers; has been deliberately indifferent to inmates', including Mr. Smith's and Ms. Works', health and safety.

90.     As a direct and proximate result of the aforementioned customs, policies, and/or practices, Mr. Smith and Ms. Works suffered injuries and damages as alleged herein.

91.     Plaintiffs seek an award of compensatory damages against the Pushmataha County Sheriff.

## PUNITIVE DAMAGES

92.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 91, as though fully set forth herein.

93.     Plaintiffs are entitled to punitive damages against the individual Defendants on their claims brought pursuant to 42 U.S.C. § 1983 as the individual Defendants'

conduct, acts and omissions alleged herein constitute malicious and/or reckless or callous indifference to Plaintiffs' federally protected rights.

WHEREFORE, based on the foregoing, Plaintiffs pray that this Court grant them the relief sought, including, but not limited to, actual damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from date of filing of suit, punitive damages in excess of Seventy-Five Thousand Dollars ($75,000.00), reasonable attorney fees, and all other relief deemed appropriate by this Court.

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
**SMOLEN & ROYTMAN**
701 S. Cincinnati Avenue
Tulsa, OK 74119
P: (918) 585-2667
F: (918) 585-2669
E-mail: danielsmolen@ssrok.com
E-mail: bobblakemore@ssrok.com
E-mail: bryonhelm@ssrok.com

*and*

Blake E. Lynch, OBA #22634
Wagner & Lynch
109 East Washington
McAlester, OK 74501
P: (918) 421-8843
F: (918) 421-8857
E-mail: blake@wagnerandlynch.com

***Attorney for Plaintiffs***