# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

MISTY and ROBERT HARDEN, *as Guardians and Next Friends of* SHAUN SMITH, *an incapacitated adult*, and SAVANAHA WORKS,

     *Plaintiffs,*

vs.

     Case No. 19-00379-EFM

B.J. HEDGECOCK, *Sheriff of Pushmataha County, Oklahoma, in his official capacity,* and TIMOTHY BYERS,

     *Defendants.*

## MEMORANDUM AND ORDER

The present action under 42 U.S.C. § 1983 arises from two separate events in the Pushmataha County, Oklahoma Jail. Plaintiffs Misty and Robert Harden, as guardians and next friends of Shaun Smith, allege that Smith was sexually assaulted by Jail guard Tamara Rashae Nichols in March of 2016. Plaintiff Savanaha Works alleges she was sexually assaulted by guard Timothy Byers in November 2017. Plaintiffs sued both guards as well as B.J. Hedgecock in his official capacity as Sheriff of Pushmataha County, alleging violations of their right to be free from excessive force and failure to protect under the Eighth and Fourteenth Amendments.

Nichols subsequently moved to dismiss the action against her under Fed. R. Civ. Pr. 4(m), based on Plaintiffs' failure to obtain timely service of process. Plaintiffs filed no response

to the motion.  The Court determined that Plaintiffs had failed to show good cause for the failure to obtain service, and granted the motion on June 9, 2020, dismissing all claims against Nichols.

Defendant Hedgecock and Byers have filed separate motions for summary judgment.  In addition, both Defendants have filed motions in limine, and Defendant Byers has filed an unopposed motion to bifurcate any trial of the claims against him from those involving the alleged assault of Smith by Nichols.  The matter is not currently set for trial.

## I.      Factual and Procedural Background[1]

### A.      Allegations of assault involving Shaun Smith

Shaun Smith was booked into the Pushmataha County Jail on February 17, 2016.  Smith had been previously confined at the jail in connection with a 2015 burglary charge.

Tamara Nichols was a jailer assigned to the overnight shift during March and April 2016. At the time, Terry Duncan was the County Sheriff and Linda Cunningham was the jail administrator.

Nichols was hired on March 3, 2016, but she had previously worked as a jailer at the jail twice before. She was terminated in 2013 for repeatedly failing to report for work.  She was terminated again after she tested positive for methamphetamine while she was pregnant.

Nichols received some on-the-job training from her previous supervisor Debbie Williams, but it is unclear the extent of actual training she was given.  Nichols testified that she received some training in booking procedures and prisoner medication.  She also claimed that if she had received better training in how to deal with inmates, it might have prevented her from having sex with inmates.

---

[1] In accordance with summary judgment procedures, the Court has set forth the uncontroverted facts, and they are related in the light most favorable to the non-moving party.

But Nichols also admitted that she did not need to be repeatedly reminded not to have sex with inmates, and that it was common sense that she should not do that.  It is also uncontroverted that jail policies and procedures in place during March 2016 prohibited sexual contact between jailers and inmates.  Further, Nichols knew that sexual contact with any inmate was against jail policy and against Oklahoma law.  Nichols never made the jail administrator, undersheriff, or sheriff aware that she wanted additional training in how to deal with inmates.

Defendants allege that jail staff completed the mandatory jail training required and provided by the Oklahoma Department of Health Jail Inspection Division (JID).  However, the cited evidence only establishes that Cunningham, the Jail Administrator, received the mandatory training.

Smith testified that he knew Nichols and other jailers had been trained on the policy which prohibited sexual contact between jailers and inmates because training includes taking a class and going over policies.

Nichols also had sex with two other inmates, Jefferson McAhren and Brian Bell.  Her encounters with McAhren occurred in his cell, by the booking area, and in the jail laundry room.  McAhren testified that he had sex with Nichols "too many [times] to count."  As a result of these encounters, Nichols became pregnant with twins.  Nichols, Bell and McAhren have all described the encounters as consensual.

Even consensual sexual contacts were contrary to jail policy.  Jail policy defines "sexual misconduct" to include "SEXUAL CONTACT WITH INDIVIDUALS [SIC] VULNERABLE T[O] THE AUTHORITY OF THE JUSTICE SYSTEM OR ANY OTHER PERSON IN A WORK SETTING."  The encounters were also in violation of Oklahoma law, which includes

within the definition of "rape" any act of sexual intercourse by an employee of a governmental agency with a person "under the legal custody or supervision" of that agency.[2]

At one point, Sheriff Duncan confronted McAhren about his contacts with Nichols, stating he had seen them on the video surveillance system going into the laundry room together for an extended period.  McAhren laughed this off and walked away.  The sexual encounters continued, and Sheriff Duncan took no action to stop it.  The failure to take any corrective action was a violation of jail policy.

It is uncontroverted that the jail had policies and procedures in place which required that inmates be locked down at night and which prohibited contraband from entering the jail. Nichols knew of these policies.

Sometime in March or April 2016, Smith asked Nichols about her relationship with McAhren, and Nichols told him she had had sex with McAhren in the laundry room.  According to Defendant, Smith then asked Nichols whether she wanted to "do laundry" with him.  The two then had sex in the laundry room.

Defendants argue that Smith was the one who initiated the encounter, by verbally asking Nichols if she wanted to have sex with him.  Defendants further claim that Smith was fully aware that he was asking Nichols to have sex with him, arguing he agreed in his deposition that he knew what he was doing when he asked Nichols to "do laundry" with him.  In contending the encounter was consensual, Defendants also point to Cunningham's testimony that, after Nichols had been arrested, Smith told her about the encounter and appeared "proud and happy about it."

---

[2] 22 Okla. Stat. § 1111(7).

Plaintiffs' version is different.  They contend that the encounter was not consensual. They note that Smith has an IQ of 57, suffers from mental illness, and has abused drugs.  In addition, Nichols was allowing illicit drugs to be smuggled into the jail, using Smith as a conduit to the Outlaw Boys gang.  Smith testified that Nichols was also giving him "prescription morphine" from the Jail's medication cabinet for his own use.  He testified that Nichols intimated to him that if he did not have sex with her, she would not long provide drugs to the gang or to him.

Defendants fail to fairly describe Smith's testimony about his understanding to the event. He testified that he told Nichols, "Well then, we can go to the laundry" after she referenced some methamphetamine he had given her and told him, "she wanted a little bit more and then was rubbing my hands."  The cited evidence shows only that Smith knew what that the term "doing the laundry" *meant*, not that it was what he wanted.

Cunningham's impression that Smith appeared happy with the encounter is also not conclusive.  In addition to Nichols' threats to interrupt the drug supply, Smith described the encounter as "awful," and something he did out of "fear."

Defendant also claims Smith admitted to purposely using his mental health issues and learning disability to manipulate people into getting what he wanted. In the cited evidence, Smith testified that because of his drug addition, "I'm always a little confused," but he understood what Nichols meant when she told him "the meth was good and she wanted a little bit more."   The manipulation apparently involves drug-seeking behavior.  Smith testified:

> Q.      Sure.  Well, and for those that are dependent on drugs, a lot of times that leads to stealing; correct?
>
> A.      Exactly.

Q.      And it also a lot of times leads to that person become crafty or deceptive with people?

A.      Yes, manipulative.

Q.      Is that correct?

A.      I've been told from Rolling Hills, you know, that I am a bad manipulator, but I didn't manipulate her in to bringing me drugs. She did it because she knew my family and she liked Lortabs. So I told her I can give her some Lortabs if you let my mom, her friend, my mom, bring me in stuff secretly.

Q.      But you would agree though that by that time in your life you'd developed some craftiness and deception that kind of stemmed from your drug use?

A.      Yes.

Q.      In that regard, your mental health conditions didn't interfere with you being crafty and deceptive to get your way; correct?

A.      Yeah, well, people always felt sorry for me and gave me my way pretty much. You know what I mean?

Q.      Right.

A.      They felt bad because I had learning and speech problems.

Q.      Is that something that you knew that you could kind of take advantage of to get your way?

A.      Kind of, yeah.

 Nichols and Smith had sex on this one occasion only.

A couple of weeks later, Deputy David Peterson watched Smith and Nichols going through inmate property on the jail's video system.  Peterson, another deputy, and an Antlers, Oklahoma police officer searched the entire jail, and found a large amount of contraband, including a pound of tobacco, a few knives and shivs, a 14-inch power tool, hypodermic syringes, marijuana and methamphetamine.

The Jail asked the Oklahoma State Bureau of Investigation (OSBI) to investigate theft or mishandling of inmate property, and the investigation uncovered the sexual encounter between

Smith and Nichols.  In an interview with the OSBI, Smith described the incident as the "worst mistake of my life."

At some point, McAhren received a text from Nichols' phone saying that when Smith got out of prison he was going to take Nichols and McAhren's children from him.  Defendant argues that Smith sent the text.  Plaintiffs object that the evidence is both hearsay and unauthenticated. Defendants cite authority holding that at summary judgment the Court may consider evidence even if it is not in a form otherwise admissible at trial.[3]  In addition, the message may to some extent be self-authenticating (who else would have sent it?), and it's not really being offered for the truth of the matter asserted (that is, what Smith will actually do, once he gets out of jail) but simply to rebut the portrait of Smith painted by Plaintiffs as a confused simpleton.

Nichols was arrested for having sex with Smith in the jail the same day she disclosed it to the OSBI, and was charged with second degree rape. She was also terminated from the jail for violating jail policies.

OSBI Investigator Sonny Stewart testified he did not find anything during the investigation suggesting the Nichols had coerced Smith into having sex.  He was also asked if he had "any direct evidence that Shaun Smith was not coerced," and responded "No."

Nichols testified she was not aware of Smith's limited mental capacity.  Smith testified that Nichols knew he was mentally ill before the sexual contact, and that they had talked about it. Smith told investigators that "I'm obviously mentally ill, " and that "I have a problem saying no and impulse control."

---

[3] *See Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

**B.     Allegations of assault involving Savannah Works**

Savannah Works was an inmate in the Pushmataha County Jail from July 2, 2017 until November 2017.

B.J. Hedgecock, the current Sheriff, became Sheriff in November 2016 and was therefore the Sheriff when the incident between Byers and Works occurred. Enjoli Johnson was the jail administrator at that time.

Works was a "trustee" within the jail and allowed more freedom of movement to perform work such as cooking, cleaning, laundry, or performing work outside the jail with the road crew. She did not know Byers prior to being incarcerated, and she was already in jail when Byers was hired as a detention officer.

Works did not know it was improper for jailers to have sex with inmates.

One of Works' cellmates, Bonnie Moore, testified that Works often flirted with detention officers (including Byers) and other male inmates, saying things like she wanted "to get her some." "She [Works] kept constantly calling him [Byers] to our cell." Moore did not hear any of the actual conversations between Works and Byers. According to Moore and another inmate, Vanessa Cabrera, Works also flashed her breasts at Byers sometime prior to November 13, 2017.

Works denies flashing her breasts at Byers. She also cites a statement made during the OSBI investigation by inmate Ashli Cheyann Whisenhunt that it was Byers who asked to see her breasts and Works' breasts. Whisenhunt showed her breasts to Byers, who stated, "That was all? I want to see it alll [sic]." Whisenhunt asked him what she meant, and Byers told her, "I want to see your pussy." Whisenhunt complied.

After "lights out" on November 13, 2017, Byers told Works that he needed her to retrieve a three extra-large jumpsuit and a piece of paper out of the laundry room. Byers was the only

officer on shift.  Works believed that Byers asked her to retrieve the items because the assigned laundry trustee was asleep.

Works got up, left her cell, exited the women's pod, and entered the laundry room as Byers followed her, but she cannot recall if he stayed in there with her the entire time. Works gave Byers the jumpsuit, but never found the piece of paper.  Byes left to deliver the jumpsuit and later returned.

While she was looking for the paper, Byers told Works to "drop them," meaning her pants.  Works said, "I don't think so," but Byers again told her to "drop them."

According to Works, she could not exit the laundry because Byers was physically blocking her.  She was frightened.  Byers then told her to drop her pants, bend over and touch her toes.  When she complied, Byers penetrated her with either his penis or finger, and asked her why she was "dry."  After having sex with her, Byers told Works to pull her pants up and she returned to her cell.

Works testified that she told Whisenhunt what Byers had done to her right after it happened.  Works told Whisenhunt that she was "tripping" or that what just happened "was not cool," without going into detail.  An OSBI investigator took Whisenhunt's statement during the subsequent investigation:

> About five to ten minutes later [after leaving for the laundry room with Byers], WORKS returned to her cell.  WORKS was shaking and said, "He fucked me down."   Both WHISENHUNT and WORKS started freaking out. WHISENHUNT asked WORKS if she wanted WHISENHUNT to have her mother contact an attorney.

Works has described the sexual contact with Byers as "rape[]".

Works did not call out for help during the encounter.  Moore has testified she thinks that, if someone called from help in the laundry room, she could have heard it in her cell.  Works has

testified she was too scared to call for help, and that it would not have helped, since Byers was the only staff officer present at the jail.

Works testified that Byers did not ask her if she wanted to have sex, and that she was surprised by his actions.  She did not offer to have sex with him, or promise him anything to have sex with him.  He did not promise her anything.  She testified that she was scared and surprised by the encounter, having previously thought Byers was gay.

In her statement to OSBI investigators, inmate Vanessa Dayani Cabrera reported that

CABRERA heard BYERS ask WORKS if she was OK.  CABRERA then heard a banging noise coming from the laundry room.  CABRERA yelled, "Ya'll can't even be quiet.  TIM, I though you were better than that.  I had high expectations for you."

Works testified she heard Cabrera saying something, but cannot remember what it was.

Cabrera told the investigators that Byers "knew he had been caught," and Cabrera and inmate Brandi Willis decided to blackmail Byers for snuff tobacco and peanut butter and jelly sandwiches.  Byers gave Cabrera a can of tobacco and hot dogs, as the jail was out of peanut butter.

The incident was partially captured by a video camera located just outside the laundry room.   There are no security cameras inside the laundry room because the room is used by inmates to change from street clothes into jail clothes. When the door is open, the camera can see a portion of the laundry room, but the right side of the laundry room is blocked from view.

According to the video, the entire laundry room interaction between Byers and Works lasted less than ten minutes.  The video show Byers' back as he appears to engage in some form of sexual contact with Works, an encounter lasting less than five minutes.

-10-

Works has testified that she was upset and cried but went to sleep.  The next morning, she got up to perform her trustee duties.  She did not report the incident to jail staff or to any inmate other than Whisenhunt.  She also did not report the incident to her family, friends, or anyone that she knew outside the jail.  Works has testified that she did not report the incident out of fear of retaliation by jail staff.

Moore has testified that Works did not appear upset or anxious after the incident, and never told her about anyone forcing themselves on her. According to Moore and inmate Kayla Wells, at some point while Works and Byers were in the laundry room, they overheard Works say to Byers, "It's whatever you want."

Defendant Byers himself offers no personal testimony, by affidavit or otherwise, on the issue of consent.  During his deposition, when asked about whether the sexual was consensual, or whether it occurred or even if he was alone with Works in the laundry room, Byers invoked his Fifth Amendment right and declined to answer.

The morning after the incident, Detention Officer Pattie Erwin arrived at the jail and began her usual rounds when Patricia Norris informed her that the night before Byers had removed Works from her cell and "forced" her to have sex in the laundry room, which Erwin immediately reported to Johnson.  Johnson informed Sheriff Hedgecock, who immediately contacted OSBI to request an investigation.  Hedgecock and Johnson coordinated with the Information Technology technician to review the surveillance video.  OSBI Special Agent Steven Carter interviewed inmates later that afternoon.  The jail nurse also performed a rape examination on Works.

Carter also interviewed Whisenhunt, Cabrera, Wells, and Moore.  Whisenhunt first denied any knowledge of the incident, but then she confirmed that she believed Byers and Works had sex.

On November 16, 2017, Works was transferred from Pushmataha County jail to McCurtain County jail.

Works has reported experiencing nightmares and anxiety about the incident.  Defendant Byers contends that Works has never discussed her nightmares or anxiety associated with the incident with anyone else, including her health care providers at other penal institutions. However, the evidence indicates that Works has reported nightmares to staff, if not the anxiety. Works testified that she did not tell any one about her anxiety because she did not think that county health staff could provide anti-anxiety medication.

Because Oklahoma law and jail policy prohibit any sexual activity with an inmate, regardless of consent, neither Sheriff Hedgecock nor Johnson made any determination of whether Works consented when they terminated Byers on November 15, 2017.   The same day, Carter filed an Affidavit of Probable Cause against Byers, who was arrested and charged with second degree rape by instrumentation.  Cater has testified that he was only concerned with potential criminal violations  reflected in any sexual contact between a detention officer and an inmate.  Works' consent was immaterial to his investigation.

Defendant Byers asserts the charges against him were dismissed without prejudice. Carter testified that the prosecutor told him the chargers would be dismissed and "that Ms. Works wasn't participating."  The motion to dismiss by the State of Oklahoma reported that Plaintiff Works, although under subpoena, had failed to appear for a hearing, and that the "State has had not contact with victim since before the last trial sitting [sic]."

C.      **Sheriff Hedgecock's administration**

When Hedgecock took over as Sheriff, he was aware of the incident between Nichols and Smith.

Hedgecock took steps to improve and expand the operating budget from the jail over and above what it had been under Duncan. By 2020, the operating budget of the Sheriff's Office, which includes jail operations, had grown by $100,000. He additionally applied for grants to receive additional money to put towards hiring personnel and upgrading equipment.

To ensure that the jail would be operated in a constitutional manner, Hedgecock asked the JID perform a jail inspection to identify deficiencies which needed to be addressed. Plaintiffs contend that the JID inspections were conducted as a part of JID's statutory duties.

This is certainly true of the 2016 JID report cited by Plaintiffs, which cited the Pushmataha jail for not submitting a training schedule for the jail. Plaintiffs cite no evidence which would controvert Hedgecock's express testimony that he separately asked JID to review the new training schedule.

Similarly, Hedgecock explicitly testified that he worked to ensure that jail staff training was completed and that the jail administrator submitted a training schedule. Plaintiffs offer no evidence which would controvert Hedgecock's testimony, beyond noting that Byers also invoked the Fifth Amendment when asked about his training. Plaintiffs argue that Byers' invocation should be the basis for an adverse inference, but there are two problems with this argument. First, even Plaintiffs acknowledge that authorities which recognize the use of adverse inference in evaluating summary judgment pleadings hold that such determinations cannot be rendered on

adverse inferences alone.[4]  Second, those authorities recognize an adverse inference against the party invoking the protection.[5]  Hedgecock did not invoke the Fifth Amendment, Byers did. Accordingly, the inference is not applicable against Hedgecock on the issue of training.

The JID report found a deficiency in operating dispatch and central control for the jail with only one jailer on staff during overnight shifts.  Hedgecock discussed this with the jail inspector and having dispatch in the jail while only one jailer was on staff is what caused the deficiency. Dispatch was therefore moved to the Antlers Police Department and the jail has not been cited for operating with a single jailer on shift since then.

County jail rules provide that "[a]t no time will there be a detention officer of the opposite sex in an inmate's cell" and "[t]here must be a same sex officer present."  Oklahoma Jail Standards are similar:  "When both male and female prisoners are housed in a facility, at least one male and one female trained jailer shall be available to perform sensitive functions and procedures as necessary to accommodate prisoner gender."

More generally, the Jail Standards also provide:  "There shall be sufficient staff to perform all assigned functions relating to security, custody and supervision of prisoners" and "[n]o one person shall be permitted to enter a prisoner's cell or other area in which a prisoner is confined, past the last locked door, without backup assistance."  Plaintiff points to the JID's findings of numerous deficiencies at the Pushmataha jail, including a failure of staff to be tested on their training.

---

[4] *SEC v. Suman*, 684 F. Supp. 2d 378, 386 (S.D.N.Y. 2010).

[5] *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them[.]");

However, as Defendant Hedgecock points out, this report was issue on May 10, 2016, before he became Sheriff.  Many of the deficiencies cited in the reports (such as a failure to lock up kitchen utensils) have no relationship to the incidents involving Plaintiffs Smith and Works. Plaintiffs also contend that drugs and other contraband were able to make their way into the jail, and that there was frequent misbehavior by other prisoners, such as returning from work drunk. Again, however, these events do not show that the Sheriff's training of jail officers was constitutionally deficient.

As noted earlier, after Hedgecock became Sheriff he moved dispatch operations out of the jail, the jail was no longer cited for staffing violations by the JID.  A jail inspector told Hedgecock that single staffing was sufficient, and that having dispatch in the jail while a single jailer was on duty was what caused the JID to assign a deficiency.  Backup and same-sex officers were always available to assist and easily accessible to jail staff.

Plaintiffs contend that single-staffing is necessarily inadequate, because the assaults of Smith and Works both occurred when only a single officer was on duty.   Hedgecock acknowledged that if the jail is double staffed with officers of each gender, it makes sexual abuse of inmates "much less likely."  At the same time, however, it doubles the staffing burden for a small county jail.  Jail policy, and Oklahoma criminal law, prohibits sexual contact between jailers and inmates.  There is no evidence that, through a lack of training, Byers and Nichols somehow believed sexual contact with inmates was permissible.

To the contrary, Nichols knew such contact was a violation of jail policy and Oklahoma law.  Byers signed an acknowledgement of this training on jail policy.  Hedgecock personally went over this policy with Byers and all other jailers.

The evidence establishes that one jailer on the overnight shift is sufficient.  Further, if a male jailer is staffing the jail alone during the overnight shift, female deputies from the Sheriff's Office or female officers from the Antlers Police Department can assist with female inmates when needed. Additionally, the evidence shows the female jail administrator in November 2017 was on call all night every night to assist the overnight jailer when necessary and other female jailers could come in to assist.

Jail and Sheriff's Office staff who had worked under Duncan either quit or were fired by Hedgecock when he took office. Hedgecock brought in a new jail administrator, hired an assistant jail administrator and changed the organizational structure of the Sheriff's Office.

Hedgecock reviewed the policies and procedures in place under Duncan and enforced existing policies. After consulting with other sheriffs on which policies and procedures were effective, he had the jail administrator and undersheriff draft new policies and procedures for the jail and revise existing policies and procedures.  Hedgecock reviewed and signed off on each new policy before they were implemented.

The sexual misconduct policy states that "[c]ontact of a sexual nature between someone acting on behalf of or in cooperation with the Pushmataha County Sheriff's Office and a Detainee, Victim, Witness or Offender is unacceptable and potentially unlawful." It goes on to identify the harmful effects of sexual misconduct and states that there is zero tolerance toward employee sexual misconduct. It specifically forbids not only unwanted sexual contact, but forbids inappropriate remarks, conversations, and romantic relationships as well.

The jail further had a policy in place to provide basic recruit, in-service, and Advanced Specialized Training to staff "to insure that staff had the skills necessary to perform their duties."

Hedgecock and Johnson testified that jailers on the overnight shift have no need to enter the cell of any inmate except in emergency situations. Sight checks are performed on the inmates by looking through the window in the cell door with a flashlight. In case an emergency situation occurred, the overnight jailer can call 911 or obtain assistance from Sheriff's Office deputies who are the same sex as the inmate.

Plaintiff complains that the jail failed to effectively enforce its own policy requiring a lockdown of cells at night.  According to Works and Moore, female inmates were routinely let out of their cells to go to the laundry room.  However, there is no evidence that Defendant Hedgecock was aware of this.

Nichols, the former jailer, was herself confined as an inmate in the jail in 2017 after Hedgecock became Sheriff.  She testified that Hedgecock changed the culture of the jail, which was run far differently than it had been under Terry Duncan. Under Hedgecock, jail staff was firmer, there was more discipline for inmates and more accountability for jail staff, and inmates were only let out of cells when they were supposed to be.

Byers was hired as a jailer for the overnight shift in October 2017. Jail Administrator Enjoli Johnson specifically reviewed the policy with Byers which prohibited sexual contact between jailers and inmates. She explained to him that there was zero tolerance for sexual contact with inmates and that violation of the policy would result in termination and criminal charges being filed. Hedgecock personally reviewed this policy with Byers as well. Johnson is sure that Byers understood the policy.

Johnson spent three nights training Byers and a fourth night shadowing him to be sure he could satisfactorily perform the job duties before she assigned him to the overnight shift alone.

She did not receive any indication from Byers during his training period that he would violate policy or have sexual contact with an inmate.

The procedure for training new hires was that the policy and procedures would be explained to them and reviewed with them, and then they would receive on-the-job training.

The jail additionally conducts in own training on topics such as OC Spray, CPR, and first aid. However, Byers did not have a chance to complete any of this training because he was terminated within a few weeks of being hired.

In 2018, jailer Ashley Parra had sex with an inmate, Rocky Rowell, in the jail after covering up the security cameras. When this was reported to Hedgecock, he terminated Parra and called the OSBI to investigate. Criminal charges were filed against Parra.

The sex between Parra and Rowell was consensual. Rowell told McAhren that he and Para had devised a scheme whereby they would have sex in the jail, and Rowell would then sue the County to get a financial settlement.

Hedgecock also terminated former jailer Matthew Bloodworth for violating the jail's policy against sexual conduct with inmates and asked the District Attorney to investigate. Bloodworth took a female inmate outside to smoke and attempted to kiss her. When that was reported to Hedgecock, he terminated Bloodworth and called the OSBI to investigate. Criminal charges were filed against Bloodworth.

While the jail administrator's office was previously located in a separate building from the jail, the jail administrator now works on-site.

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[6] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[7]  The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[8]  The nonmovant must then bring forth specific facts showing a genuine issue for trial.[9]  These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[10]  The Court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[11]

### III.    Analysis

Defendant Byers seeks summary judgment on the grounds of qualified immunity, arguing that Plaintiff Works' claim fails because she consented to the sexual contact, and there is no clearly-established law holding that consensual sex between an inmate and a prison guard violates the former's constitutional rights.

---

[6] Fed. R. Civ. P. 56(a).

[7] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (citation omitted), *abrogation on other grounds recognized by Bertsch v. Overstock.com*, 684 F.3d 1023, 1029 (10th Cir. 2012).

[8] *Thom v. Bristol-Myers Squibb Co*., 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[9] *Garrison v. Gambro, Inc*., 428 F.3d 933, 935 (10th Cir. 2005) (citation omitted).

[10] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (quoting *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670-71 (10th Cir. 1998)).

[11] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

-19-

Public officers enjoy a qualified immunity to suit under § 1983, which applies unless their conduct was unreasonable in light of clearly established law. "If the law at the time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation."[12]

Once a defendant has asserted qualified immunity, the burden is on the plaintiff to prove (1) the officer violated a federal constitutional or statutory right, and (2) that the right was clearly established at the time of the unlawful conduct.[13]   A right is "clearly established" if Supreme Court or Tenth Circuit precedent (or the weight of authority from other circuits) would put reasonable officers in the defendants' position on notice they were violating the constitution.[14] The law must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[15] This does not require the existence of a case exactly on point,[16] but does require that the existing caselaw be sufficiently clear to place the constitutional issue "beyond debate." "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.' "[17]

The Court has the discretion to determine the order in which these requirements are addressed;[18] immunity exists if either element is absent.[19]   Only when a plaintiff satisfies this

---

[12] *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

[13] *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009)

[14] *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1210 (10th Cir. 2017).

[15] *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (citation omitted).

[16] *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

[17] *Mullenix*, 577 U.S. at 12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

[18] *Pearson*, 555 U.S. at 236.

heavy burden must the defendant then satisfy the traditional summary judgment standard.[20]   In determining whether the law was clearly established, the dispositive question is "whether the violative nature of particular conduct is clearly established," which "must be undertaken in light of the specific context of the case, not as a broad general proposition."[21]

The issue of consent is also raised by the motion for summary judgment of Defendant Hedgecock, who has been sued in his official capacity.   He seeks summary judgment on two grounds—first, that Plaintiffs have failed to show an underlying constitutional violation, because Smith and Works consented to the respective sexual contacts.   Second, even if the sex was nonconsensual, he argues there is no basis for holding his office responsible for the actions of Byers or Nichols.   That is, he argues that there were no official policies that led to the assaults on Plaintiffs, training for the guards was adequate, and there were no other failures leading to any violation of Plaintiff's rights.

## A.     A factual issue exists on consent.

"[S]exual abuse of those in jail or prison violates the Constitution."[22]    "With regard to . . . sexual assault claims, . . . an 'inmate has a constitutional right to be secure in her bodily

---

[19] *Medina v. Cram,* 252 F.3d 1124, 1128 (10th Cir. 2001) (citation omitted).

[20] *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1212 (10th Cir. 2019).

[21] *Mullenix*, 577 U.S. at 12 (citations and quotation marks omitted) (emphasis in *Mullenix*.)

[22] *Brown v. Flowers*, 974 F.3d 1178, 1185 (10th Cir. 2022) (citing *Giron v. Corr. Corp. of America*, 191 F.3d 1281, 1289 (10th Cir.1999).

integrity and free from attack by prison guards.' "[23]  Such a claim "requir[es] at least some form of coercion (not necessarily physical) by the prisoner's custodians."[24]

Accordingly, a court may dismiss an inmate's claim of sexual abuse where there is "overwhelming evidence of consent."[25]  But at the same time, the Court must take account of "[t]he power dynamics between prisoners and guards [that] make it difficult to discern consent from coercion."[26]  A court addressing the question of consent may consider "the inherently coercive nature of prisons," evidence that a guard gave the inmate presents, and the inmate's testimony, "including the fact that she was crying during the sex."[27]

## 1.   Evidence of Plaintiffs' sexual history

Before addressing the arguments relating to the whether the sexual encounters were consensual, the Court must first address the evidence proffered by Defendants touching on Plaintiffs' sexual history.

Defendants assert that Smith has a history of having sexual relationships with staff at facilities where he has been confined, and that before the events at the jail he was sexually involved with a staff member at the Meadowbrook treatment facility prior.  Similarly, in his motion for summary judgment, Defendant Byers includes a preliminary discussion of Works' criminal history, including her work as a prostitute.  He also cites evidence allegedly showing that Works had consensual sexual encounters while she was in custody with other inmates.

---

[23] *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir.1998) (quoting *Hovater v. Robinson*, 1 F.3d 1063, 1068 (10th Cir. 1993).

[24] *Graham v. Sheriff of Logan County*, 741 F.3d 1118, 1126 (10th Cir. 2013).

[25] *Id*.

[26] *Id*.

[27] *Brown*, 974 F.3d at 1187.

Plaintiffs object to this evidence under Federal Rules of Evidence Rule 412(a)(1) as evidence of sexual history, improper character evidence under Rule 404, and as irrelevant under Rule 403.   In their Reply, Defendants argue that the Court may nonetheless consider the evidence on summary judgment, citing *Argo v. Blue Cross and Blue Shield, Inc.*[28]   The Reply does not discuss either Rule 404 or 412(a)(1), or explain why the evidence would be substantively admissible at trial.

Plaintiffs place the most weight on first of the cited rules, arguing that "under Rule 412, 'evidence offered to prove that a victim engaged in other sexual behavior' is categorically inadmissible 'in a civil . . . *proceeding involving alleged sexual misconduct . . . .*' "[29]

But this misreads the Rule.  Rule 412(a) provides a general rule of exclusion, Rule 412(b) provides specific exceptions, with Paragraph (b)(2) governing civil cases:

> In a civil case, the court may admit evidence offered to prove a victim's sexual behavior or sexual predisposition if its probative value substantially outweighs the danger of harm to any victim and of unfair prejudice to any party. The court may admit evidence of a victim's reputation only if the victim has placed it in controversy.

Far from "categorically" barring such evidence, the Rule provides a specific standard for its admission. The Advisory Committee Note to the Rule states:

> The balancing test requires the proponent of the evidence, whether plaintiff or defendant, to convince the court that the probative value of the proffered evidence "substantially outweighs the danger of harm to any victim and of unfair prejudice of any party." This test for admitting evidence offered to prove sexual behavior or sexual propensity in civil cases differs in three respects from the general rule governing admissibility set forth in Rule 403. First, it [r]everses that usual procedure spelled out in Rule 403 by shifting the burden to the proponent to demonstrate admissibility rather than making the opponent justify exclusion of the evidence. Second, the standard expressed in subdivision (b)(2) is more stringent

---

[28] 452 F.3d 1193 (10th Cir. 2006).

[29] Doc. 100 at 8 (quoting and adding emphasis to Rule 412(a)(1).

than in the original rule; it raises the threshold for admission by requiring that the probative value of the evidence *substantially* outweigh the specified dangers. Finally, the Rule 412 test puts "harm to the victim" on the scale in addition to prejudice to the parties.[30]

As noted earlier, Plaintiffs also object to such evidence under Rules 403 and 404. By creating as specific, higher standard for admissibility,[31] Rule 412(b)(2) essentially supplants Rule 403. It is unclear whether such evidence must independently meet the requirements of 404,[32] but there is substantial reason to believe Rule 412(b)(2) supplants that Rule as well. The text of Rule 412(b)(2) itself provides for that result, observing that if the balancing test in that provision is met, "the court *may admit* evidence offered to prove a victim's sexual behavior." The Rule makes no mention of any additional requirement. Moreover, the Advisory Committee Note which has been relied upon for a different conclusion was a note to a preliminary draft to the 1994 Amendment to the Rule; the language does not appear in the Note to the present Rule. Courts which have addressed the issue have not imposed Rule 404 as an additional burden on top of Rule 412(b)(2).[33]

Other than lodging the bare objection itself, Plaintiffs make no attempt to discuss the application of any of the cited rules.

---

[30] *Id.*, Advisory Comm. Note (emphasis in original).

[31] *See Wolak v. Spucci*, 217 F.3d 157, 160 (2d Cir. 2000) (noting that Rule 412 reverses "the usual presumption of admissibility set forth in Fed. R. Evid. 403").

[32] *See* Wright & Miller, 23 *Fed. Prac. & Proc. Evid.* § 5376 (2d ed.) (arguing on basis of a Committee Note to the Preliminary Draft to the 1994 Amendment the Rule, that "evidence offered under Rule 412(b) must be otherwise admissible under the Federal Rules of Evidence").

[33] *See Blackmon v. Buckner*, 932 F.Supp. 1126 (S.D. Ind., 1996) (admitting evidence of jail inmate's consensual sexual relationships with other inmates, without addressing Rule 404, as "Plaintiff's claim here is not against the inmates who allegedly assaulted him, but against jail officials who, he alleges, acted with deliberate indifference to a significant danger to him").

Defendants fare no better in explaining why the Court should consider evidence of other sexual behavior, relying entirely on their citation to *Argo*, which they read as some sort of general license to ignore the rules of evidence.  But that case simply provides that, at the summary judgment stage, substance controls over form—but the substance must still be admissible evidence:

> At the summary judgment stage, evidence need not be submitted in a form that would be admissible at trial. Parties may, for example, submit affidavits in support of summary judgment, despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form. Nonetheless, the content or substance of the evidence must be admissible. Thus, for example, at summary judgment courts should disregard inadmissible hearsay statements *contained* in affidavits, as those statements could not be presented at trial in any form. The requirement that the substance of the evidence must be admissible is not only explicit in Rule 56, which provides that "[s]upporting and opposing affidavits shall ... set forth such facts as would be admissible in evidence," but also implicit in the court's role at the summary judgment stage. To determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury.[34]

The Court is not without guidance on the issue.  In *Chapman v. Carmike Cinemas*,[35] the district court included reference to the plaintiff's prior sexual behavior in granting summary judgment against her claim of a hostile working environment.  The plaintiff argued on appeal that the evidence was inadmissible under Rule 412.  The Tenth Circuit held that it need not address the issue, finding that the defendant was otherwise entitled to the affirmative defense that it had no notice of any hostile environment, even if it existed.[36]  But while the court did not formally address the issue, it offered the following observation:

---

[34] *Argo*, 452 F.3d at 1199 (internal quotations and citations omitted, emphasis in *Argo*).

[35] 307 F. App'x 164 (10th Cir. 2009).

[36] *Id.* at 172 (citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)).

Citing 23 Charles A. Wright and Kenneth W. Graham, Jr., FEDERAL PRACTICE AND PROCEDURE: EVIDENCE, § 5391.1 (1998 Supp.), [defendant] argues that Rule 412 applies only at trial, not in summary judgment proceedings. Wright and Graham cites no authority for this proposition, and at least two courts disagree. *See Davis v. DeKalb County Sch. Dist.*, 233 F.3d 1367, 1374 n. 13 (11th Cir.2000) (*per curiam*) (noting that the district court erred in considering evidence, on summary judgment, that the circuit court held would be inadmissible under Fed.R.Evid. 412(b)(2)); *Dunegan v. City of Council Grove*, 189 F.R.D. 649, 652 (D.Kan.1999) ("[W]e do believe that the requirements of Rule 412 must be applied to summary judgment proceedings."). Considering the well-established rule that summary judgment must rest only on admissible evidence, *see Wright-Simmons v. City of Okla. City*, 155 F.3d 1264, 1268 (10th Cir.1998), and that evidence subject to Rule 412 is not admissible until declared so under the terms of the rule, *we see no reason why Rule 412 should not be applied in summary judgment proceedings*, but that issue need not be resolved in this appeal so we leave it open.[37]

Defendants as proponents of the evidence have the burden to explain why it would be substantively admissible under Rule 412(b)(2). They have not even attempted to meet this burden, and accordingly the proffered evidence of the sexual history of Smith and Works plays no role in the Court's findings on the issue of consent.

## 2.   A jury could rationally determine Smith did not consent.

There is evidence from which a reasonable fact-finder could find that Smith did not consent to the sexual encounter with Nichols. Smith is a drug addict and suffers from substantial mental impairment. Although Nichols claimed that she was unaware of that impairment, Smith told OSBI investigators that his impairment is "obvious," that Nichols was aware of it, and that the two had in fact talked about it prior to the sexual encounter. According to Smith, he agreed to the encounter proposed by Nichols because he was afraid that she was cut off his access to drugs.

---

[37] *Id*. at 172 n. 2 (emphasis added)

There is, to be sure, evidence that encounter was consensual.  In the audio recording of his statement to OSBI investigators, Smith jokingly characterizes the encounter with Nichols—to the laughter of those present—as the "worst mistake of my life."

Nevertheless, it is not the Court's role in resolving a motion for summary judgment to weigh the evidence.  While there is some evidence the sexual contact between Nichols and Smith was consensual, that evidence is not overwhelming or conclusive.

**3.      A jury could rationally determine Works did not consent.**

The Court also concludes a material issue of fact exists as to whether the sexual encounter between Byers and Works was consensual.  The question is made more difficult because Defendant Byers has refused to answer questions about the incident, and because Plaintiff's response, remarkably, offers no affidavit from Works nor any additional evidence at all.  Accordingly, the only evidence on the issue of consent are the short excerpts from Works' deposition offered by Defendants and the video, coupled with the adverse inference arising from Byers' invocation of this Fifth Amendment rights.[38]

The parties dispute the strength of the inference that may arise from Byer's invocation of the Fifth Amendment, but for purposes of resolving the motions for summary judgment, it is sufficient to note that, by remaining silent, Byers offers no positive proof that Works consented to having sex.  The Defendants are thus reduced to suggesting that Works' version is blatantly contradicted by other evidence.

Defendant Byers contends the video "shows a few discrepancies" with Works' version of events.  He notes an early section of the video shows Byers lifting Works up onto a counter in

---

[38] *Such an invocation alone, by itself, is insufficient to support an award of summary judgment. See S.E.C. v. Suman*, 684 F. Supp. 2d 378, 386-87, (S.D.N.Y. 2010), *aff'd*, 421 Fed. App'x 86 (2d Cir. 2011).

the laundry room, and suggests this is contrary to Works' story that she was facing away from Byers when the sexual assault occurred.  He argues that, while Works denied finding the piece of paper, the video shows her finding a paper slip that she picks up off the floor and hands to Byers, and afterwards she left the laundry room without appearing distraught, upset, nervous, or anxious. Finally, he notes the reaction on Johnson, the jail administrator, to the video.  She testified that she did not see Byers use any physical force in the video.  She stated that the video shows some form of inappropriate contact, but does not actually show sexual intercourse.

Defendant Hedgcock similarly argues that the video fails to show evidence that Byers used any physical force or intimidation during the encounter.

There is evidence that a rational fact-finder could find Works did not consent to sexual relations with Byers.  Works has described the contact as a "rape."  She testified that she was unable to leave the room because Byers was in the way, that his preemptory instruction to "drop them," indicating her pants,  frightened her.  She testified that "whenever you're in jail where you don't know anybody, you know, they have all the power over you.  They can do whatever they want to."  She was concerned that Byers or other staff might retaliate against her.

Defendant Byers' arguments do not compel a finding that consent existed.  Johnson's impression of what the video showed is not controlling.  Similarly, the suggestion that Works could have called for help from other inmates carries little weight.  As Works testified, the laundry room was "not very far, but what are two females going to do that are inmates?  I mean, what are they going to do?"  Given the limited view of the camera, the Court is unable to confirm Defendants' claims of inconsistencies in Works' version of events.  But even assuming the "few

discrepancies" identified by Byers are real, this is a far cry from the "overwhelming evidence of consent"[39] which would entitle Defendants to summary judgment on the issue.

This is not to say there is no evidence suggestive of consent. Works testified she does not recall if she told Byers she did not want to have sex. And Defendants are correct that at the conclusion of the event, the video does not show Works was distraught, upset, nervous, or anxious. Plaintiff objects that this is simply counsel's opinion and "not evidence," but this is the impression any reasonable viewer of the video would have. Indeed, after the apparent sexual contact and Byers has left the laundry room, Works appears to continue to search for the paper, before standing at the door, making a shrugging gesture with her hands, as if she was primarily concerned about locating the missing paper.

Or perhaps the trauma of the event may have taken a few minutes to manifest itself. The calm demeanor of Works on the video is counterbalanced by the testimony of Works and Whisenhunt that Works was distraught by the time she returned to her cell. "When parties present conflicting evidence at the summary judgment stage, a court may rely on video footage to grant summary judgment if the recording 'utterly discredit[s]' the opposing party's version of the facts.' "[40] Here, the video may provide some fodder for Defendants' claim of consent, but it does not utterly discredit Works' testimony that she did not consent.

As there is some evidence the contact was not consensual, Defendant Byers is not entitled to qualified immunity. Defendant argues in his motion that the law has not clearly established that the constitution prohibits consensual sexual relations between guards and prisoner. But the

---

[39] *Graham*, 741 F.3d at 1124.

[40] *Ross v. Burlington N. & Santa Fe Ry. Co.*, 528 F. App'x 960, 964 (10th Cir. 2013) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Tenth Circuit "ha[s] long held that nonconsensual, coerced sex between a jailer and an inmate violates the Constitution.[41]   Such violations are not limited to the use of physical force,[42]  and a court may properly consider the inherently coercive nature of imprisonment.

Because the Court is unable to determine, beyond a reasonable doubt, that the sexual contact between Byers and Works was consensual, it finds that Defendant Byers is not entitled to summary judgment based on qualified immunity.   Similarly, the Court rejects Defendant Hedgecock's argument Plaintiffs suffered no underlying constitutional violation, and must proceed below to determine whether there is some basis for holding the Sheriff responsible for the assaults by Nichols and Byers.

**B.  Defendant Hedgecock is not liable for the assaults by Nichols and Byers.**

Plaintiffs contend that the sexual assaults violated the rights under the Eighth and Fourteenth Amendments through excessive force and by a failure to protect.  The Tenth Circuit has "explained at length which amendment applies to excessive-force claims at each phase of the criminal justice process and what type of government intrusion the corresponding amendment protects against."[43]   The rights of pretrial detainees are governed by the due process clause of the Fourteenth Amendment; the rights of persons convicted of criminal offenses are governed by the Eighth Amendment.[44]

---

[41] *Brown v. Flowers*, 974 F.3d 1178, 1187 (10th Cir. 2020).

[42] *Id.* at 1186 ("[O]ur caselaw does not make a distinction between sexual abuse carried out through physical and nonphysical coercion.").

[43] *Geddes v. Weber Cnty.*, 2022 WL 3371010, at *4 (10th Cir. 2022).

[44] *Id*. at *4-5.

Defendant Hedgecock argues that Smith's excessive force claim should be analyzed under the Eighth Amendment, as he was serving time in the jail on an earlier charge.  Typically, under the Eighth Amendment:

> an excessive force claim involves two prongs: (1) an objective prong that asks if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and (2) a subjective prong under which the plaintiff must show that the officials acted with a sufficiently culpable state of mind.[45]

Similarly, an Eighth Amendment failure to protect claim requires both an objective element and subjective elements—that a person was detained under conditions posing a substantial risk of serious harm to his health or safety, and that authorities were deliberately indifferent to that risk.[46]  The same is standard is applied for a failure to protect under the Fourteenth Amendment.[47]

Defendant acknowledges that pretrial detainees alleging excessive force under the Fourteenth Amendment need not satisfy the second, subjective element.  "[A] pretrial detainee can establish a due-process violation by 'providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose.' "[48]  Defendant argues that Smith was being held in the jail following his conviction on a separate criminal offense, and then proceeds to argue that Smith's claims necessarily fail on both prongs—as any sexual contact with Nichols was consensual, and

---

[45] *Giron v. Corrs. Corp. of Am.*, 191 F.3d 1281, 1290 (10th Cir. 1999).

[46] *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1995).  *See also Smith v. Cummings*, 445 F.3d 1254, 1258 (10th Cir. 2006).

[47] *See Hooks v. Atoki*, 983 F.3d 1193, 1203 (10th Cir. 2020) (Eighth Amendment analysis applies to failure to protect claim brought by pretrial detainee).

[48] *Colbruno v. Kessler*, 928 F.3d 1155, 1163 (10th Cir. 2019) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015).  *See also Geddes,* 2022 WL 3371010, at *7 (10th Cir. 2022) citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)

there is no evidence that Sheriff Duncan knew of and disregarded a substantial risk that Smith would be sexually assaulted.

The Court agrees that Plaintiff has failed to show evidence of a culpable state of mind by Defendant, but Defendant is wrong that Smith was a prison inmate and thus his excessive force claim requires both objective and subjective elements.

Defendant claims  that Smith was booked into the jail "after being sentenced on a 2015 burglary charge."  However, the cited Judgment and Sentence imposed in Pushmataha County District Court, in Case  (Case No. 2015-108) was entered on June 6, 2018, well after the alleged assault occurred. The Booking Information Sheet at the jail lists Smith's "INMATE STATUS" as "CONFINED BUT NOT CONVICTED."

Accordingly, both Smith and Works were pretrial detainees while in the Jail.  As noted earlier, a material question of fact exists whether the sexual encounters were consensual, and the Court accordingly assumes for purposes of summary judgment that both Plaintiffs were sexually assaulted.  Because their constitutional rights were objectively violated, their excessive force claims are not subject to summary judgment on that basis.

The Court grants summary judgment as to Plaintiffs' failure-to-protect claims under the Fourteenth Amendment.  An official entity is not responsible for an underlying constitutional violation by its employees on the grounds of respondeat superior alone.[49]  However, the municipal entity may be responsible for violations resulting from the "persistent and widespread . . . practices of  officials."[50]  This municipal entity must be "the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite

---

[49] *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694-95 (1985).

[50] *Id.* at 691.

degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."[51]   Municipal liability "attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible."[52]

In contrast to claims of excessive force, pretrial detainees raising claims of a failure to protect must show both an objective constitutional violation, and a culpable state of mind by a defendant official, meaning that he was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[53]   This deliberate indifference standard "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."[54]   The standard "may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."[55]

Here the uncontroverted evidence does not show that either Sheriff Duncan or Hedgecock was deliberately indifferent to the risk of nonconsensual sexual assault.  Nichols assaulted Smith in March or April of 2016.  Plaintiffs have failed to show that at that time there were other instances of prior coercive sexual assaults occurring at the Jail which Sheriff Duncan ignored.

---

[51] *Bryan Cnty.*, 520 U.S. at 404.

[52] *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).

[53] *Farmer*, 511 U.S. at 837.  *See also* Contreras ex rel. A.L. v. Dona Ana Cnty. Bd. of Cnty. Comm'rs, 965 F.3d 1114, 1130 n. 3 (Tymkovich, C.J., concurring) ("For years, . . . federal courts across the land, including the Tenth Circuit, have relied on [*Bell v.*] *Wolfish*[, 441 U.S. 520 (1979)] to apply *Farmer*'s subjective deliberate-indifference standard to claims that state actors failed to protect pretrial detainees in violation of the Fourteenth Amendment.").

[54] *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997).

[55] *Barney*, 143 F.3d at 1307 (citation omitted).

When Byers assaulted Works a year and half later, Defendant Hedgecock was aware of the prior incident involving Smith and Nichols.  However, as the new Sheriff, Hedgecock had substantially revised Jail policies and personnel, and it is uncontroverted that enforcement of Jail policies and procedures became stricter.  When Nichols revealed her encounter with Smith to the OSBI, she was immediately terminated and criminally prosecuted.  Under Hedgecock, Jail personnel—including Byers—were trained that any sexual contact between guards and detainees would also result in termination and prosecution.

Of course, Plaintiffs have pointed to evidence showing various rules at the Jail were otherwise violated.  Detainees at the Jail were able to smuggle in drugs, and in some instances guards may have engaged in *consensual* sexual relations with detainees.  But Plaintiffs have supplied no evidence that either Sheriff Duncan or Hedgecock turned a blind eye to the particular danger of nonconsensual sexual assault.  The only cases of nonconsensual sexual assault at the Jail are those alleged by Smith and Works.   In each instance, the perpetrator was swiftly terminated and prosecuted for criminal sexual assault.

Given the absence of evidence that the Sheriff was deliberately indifferent to sexual assaults in the Jail, the failure to protect claim is subject to summary judgment.

The Court reaches the same result as to the Plaintiff's claim that Defendant Hedgecock is otherwise responsible in his official capacity for the assaults committed by Nichols or Byers.  Plaintiffs claims that the Pushmataha Sheriff is responsible for the sexual assaults by failing to adequately train or supervise guards, and by failing to staff the jail adequately.   The uncontroverted evidence fails to support these claims.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."[56]  "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."[57]  The Tenth Circuit has observed that "[s]pecific or extensive training hardly seems necessary for a jailer to know that sexually assaulting inmates is inappropriate behavior."[58]

Nichols was adequately trained.  She had sex with Smith even though she knew that it was contrary to policy and indeed contrary to Oklahoma criminal law.  The same is true of Byers.  Byers was informed that there was zero tolerance for violations of the sexual misconduct.  Plaintiffs claim that both Smith and Works were coerced into having sex against their will, that they were raped.  Their allegations suggested particular depravity by both Nichols and Byers, with the former deliberately using Smith's limited mental capacity and drug addition to force herself on him, and the latter forcing Works to have sex with him even as he knew she had no desire for the encounter.  Plaintiff have not shown how any amount of training would have overcome such depraved and conscious disregard of Oklahoma criminal law.

Plaintiffs argue that the Sheriffs failed to protect them against injury by understaffing the jail, with only one person on duty.  But "the failure—even the knowing failure—to ensure adequate staffing at a prison does not, *per se*, amount to a constitutional violation," supervisory officials are responsible only if "such understaffing specifically led to the rape or the brutal

---

[56] *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

[57] *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).

[58] *Barney*, 143 F.3d at 1308 (citing *Andrews v. Fowler*, 98 F.3d 1069, 1077 (8th Cir. 1996) ("In light of the regular law enforcement duties of a police officer, we cannot conclude that there was a patently obvious need for the city to specifically train officers not to rape young women.").

assault" of a detainee.[59]   A detainee injured by a guard's assault "must allege more than generalized conditions at the prison, like inadequate staffing and security camera shortages; she must plead [the official]'s subjective awareness of prior incidents of sexual abuse, and that his resulting inaction caused subsequent abuse."[60]

The evidence fails to show that the jail was not appropriately staffed.  While the State initially cited staffing as a problem at the Jail, this was because the jail staff officer also served as a dispatcher.  Once the dispatch responsibility was redirected, the State apparently had no problem with the level of staffing.

The evidence establishes that one jailer on the overnight shift is sufficient. If a male jailer is staffing the jail alone during the overnight shift, female deputies from the Sheriff's Office or female officers from the Antlers City Police Department are available to help with female inmates when needed.  Additionally, the female jail administrator in November 2017 was on call all night every night to assist the overnight jailer when necessary and other female jailers could come in to assist.

Plaintiffs argue that their claims are supported by the Tenth Circuit's decision in *Tafoya v. Salazar*,[61] but that case bears little resemblance to this action.  The female jail detainee in that case was assaulted in 2001 by a male detention officer.  In holding that she had presented an actionable claim against the county sheriff, the *Tafoya* court stressed that he was also the sheriff in 1998, when "two independent incidents of sexual assault occurred in the jail,"[62] and that in a

---

[59] *Atkins v. CoreCivic, Inc.*, 2021 WL 4773080, at *5 (M.D. Tenn. 2021) (citations omitted).

[60] *Green v. Padilla*, 484 F. Supp. 3d 1098,1159 (D.N.M. 2020).

[61] 516 F.3d 912 (10th Cir. 2008).

[62] *Id*. at 914.

prior case,[63] "we found evidence that these assaults were the product of unconstitutional jail conditions maintained through the deliberate indifference of Sheriff Salazar, and noted many ways in which his administration of the jail fell below an acceptable standard."[64]   Although the sheriff "was on notice of the dangerous conditions in the jail and was aware that his own indifference toward jail operations had contributed to those conditions . . . he made no effort to alter his own managerial strategy [or] impose a serious threat of discipline for policy violations upon his detention staff."[65]   The plaintiff also provided expert evidence that the jail "deviated from generally accepted standards," as well as evidence that the sheriff allowed an "undisciplined policy of 'anything goes' among the detention officers," and that he further had "knowingly hired employees with criminal records showing a propensity for violent and dangerous behavior," including assault and resisting arrest.[66]   "Yet even after the three civil suits for the 1998 assaults were filed against him, Sheriff Salazar continued to abstain from any meaningful presence at the jail, did not ensure an adequate grievance procedure was in place, and vested responsibility for jail management in unqualified administrators and supervisory staff with criminal histories."[67]

Such evidence is not present here.   There was no prior civil litigation which established the jail was mismanaged.   Plaintiffs have offered no evidence, expert or otherwise, that the jail was actually understaffed, in comparison to similarly-sized counties, at the time of the respective

---

[63] *Gonzales v. Martinez*, 403 F.3d 1179 (10th Cir. 2005).

[64] *Tafoya*, 516 F.3d at 914.

[65] *Id*. at 917-18.

[66] *Id*. at 917.

[67] *Id*. at 922.

assaults.  Although Plaintiffs note the jail had been cited for its staffing policy by the JID, this was related to the practice in which jail staff were at one point required to also serve as radio dispatchers.  After the responsibility for dispatching was removed from the jail staff and given to the Antlers police department, the JID has not cited the Jail, or otherwise indicated that it fell below appropriate standards.

There is no evidence that, at the time of the assault on Smith, the Sheriff's office was aware of an ongoing danger of nonconsensual sexual assault.   There is no evidence that Nichols or Byers had any violent criminal history.  By the time Defendant Hedgecock became Sheriff, his office had learned of the incident involving Nichols and Smith.  But Nichols had been terminated and prosecuted for rape.  Upon taking office, Hedgecock terminated the staff at the jail and hired his own officers.  He personally informed the new staff, including Byers, of the policy barring sex with inmates.

Byers knew of the prohibition and Defendant' Hedgecock's zero tolerance policy.  He knew that it was criminal conduct.  That he nonetheless had sex with a jail inmate in view of a video camera surely indicates such a wanton and reckless commitment to sexual assault that additional policies or staffing would not have achieved a different result.

The same is true of the claim that guards or staff allowed drugs into the jail or violated jail standards by, for example, failing to monitor kitchen utensils.  Plaintiffs offer no evidence that the Sheriffs Duncan or Hedgecock were aware of this, if it actually occurred.  The evidence before the Court presents a material question of fact as to whether Smith or Works were sexually assaulted.   But the evidence does not show that such assaults were caused by any policy, procedure, or other action by the Pushmataha Sheriff.

Given this conclusion, Defendant Hedgecock is properly dismissed from the action and the motion to bifurcate the action by Defendant Byers becomes moot.  The Court will schedule a trial on the remaining claim of Plaintiff Works against Defendant Byers by separate Scheduling Order, as well as a hearing of Defendant Byers' motion in limine.  (Doc. 88).

**IT IS THEREFORE ORDERED** that Defendant Byers' Motion for Summary Judgment (Doc. 84) is denied; Defendant Hedgecock's Motion for Summary Judgment (Doc. 82) is granted.  The motion to bifurcate (Doc. 54) and the motion in limine of Defendant Hedgecock (Doc. 89) are denied as moot.

**IT IS SO ORDERED**.

Dated this 29th day of September, 2022.


ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE